COHEN, J.
Russell 'Elmer appeals from the judgment and sentence entered after a jury found him guilty of three counts of capital sexual battery on a child less than twelve years old. On appeal, Elmer raises six arguments. Among them, he contends the trial court erred in prohibiting him from using a prior inconsistent statement to cross-examine the victim, and in precluding him from calling a detective to offer extrinsic evidence to impeach the victim. We agree and reverse.
The victim, C.J., was the daughter of Elmer’s then-girlfriend, now-wife, Ann. There was a significant delay from the time the sexual misconduct occurred until charges were filed.[1] The sole issue raised at trial was whether the sexual abuse began prior to C.J.’s twelfth birthday, which was on April 21, 1989. It is undisputed that Elmer started abusing C.J. after he moved in with Ann, which occurred shortly after the two began dating. There was conflicting testimony, however, as to when Elmer started dating Ann. Both the State and the defense presented a series of witnesses on the issue, and extrinsic and an-ticdotal evidence was offered to assist in determining that date.[2]
C.J. testified that the sexual abuse began when she was eleven years old and continued regularly for a number of years. An audiotape of a meeting between Elmer and C.J., recorded by law enforcement, was played for the jury. When confronted at the meeting, Elmer admitted to the sexual abuse and apologized to C.J. When she attempted to set the time frame of the abuse, Elmer neither admitted nor denied *201 her timeline, which placed the beginning of the sexual abuse prior to her twelfth birthday.[3]
Elmer attempted to dispute C.J.’s testimony that the abuse began before her twelfth birthday by using a police report she made to law enforcement in 1995.[4] The report included statements from C.J. that suggested the abuse commenced after she turned twelve years old.[5] Prior to trial, the State filed a motion in limine, seeking to preclude the use of the arguably prior inconsistent statements contained within the report. The motion also sought to prevent Elmer from eliciting testimony about the report from Detective Lucas, who investigated C.J.’s allegations of sexual abuse in 1995 and compiled the report. During a hearing on the motion, the State argued that C.J.’s statements in the report were hearsay. Elmer countered that the statements were being offered for impeachment purposes rather than for substantive evidence. As to Detective Lucas, the State contended the trial court should prohibit the detective from testifying because she had no independent recollection of the 1995 investigation. Elmer argued the detective’s report was admissible as a recorded recollection, pursuant to section 90.803(5), Florida Statutes (2010).
A proffer of Detective Lucas’s testimony revealed that she had no recollection of the case. The detective acknowledged that it was her handwriting on the report and that she generated such reports during the normal course of her duties. When asked by Elmer whether the report accurately reflected what she had been told, the detective responded, “What is there is what I was given.” Again, Elmer argued that the report was not hearsay because it was being offered for impeachment purposes. The State acknowledged that Elmer sought to use the detective to impeach the victim, but noted that C.J. testified she did not remember what she told Detective Lucas during the 1995 investigation. The trial court granted the State’s motion in limine, ruling that Elmer could not use the report to impeach C.J. and that Detective Lucas could not be questioned about the report because it was hearsay. When Elmer attempted to question C.J. about the 1995 report at trial, the trial court precluded him from doing so.
This Court reviews the trial court’s limitation of cross-examination and exclusion of evidence for an abuse of discretion. See Boyd v. State, 910 So.2d 167, 185 (Fla.2005); Zack v. State, 753 So.2d 9, 25 (Fla.2000). A criminal defendant should be afforded wide latitude to cross-examine the State’s witnesses, especially when cross-examining a key prosecution witness. See McDuffie v. State, 970 So.2d 312, 325 (Fla.2007); Robinson v. State, 438 *202 So.2d 8, 10 (Fla. 5th DCA 1983). As the United States Supreme Court explained in Davis v. Alaska, 415 U.S. 808, 316, 94 5.Ct. 1105, 39 L.Ed.2d 347 (1974):
Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness’ story to test the witness’ perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.
It is axiomatic and fundamental to our system of justice that a party may impeach a witness by introducing statements of the witness which are inconsistent with the witness’s present testimony. See McBean v. State, 688 So.2d 383, 384 (Fla. 4th DCA 1997); see also § 90.608(1), Fla. Stat. (2010). In Pearce v. State, 880 So.2d 561 (Fla.2004), the supreme court explained:
[IJntroduction of a prior statement that is inconsistent with a witness’s present testimony is also one of the main ways to attack the credibility of a witness. The Florida Evidence Code does not require the witness’s prior inconsistent statement to be reduced to writing in order to impeach the witness under section 90.608(l)(a). The theory of admissibility is not that the prior statement is true and the in-court testimony is false, but that because the witness has not told the truth in one of the statements, the jury should disbelieve both statements.
Id. at 569 (citations and quotation omitted). Thus, a prior inconsistent statement admitted for impeachment purposes is not hearsay because it is not being offered for the truth of the matter asserted. See Marshall v. State, 68 So.3d 374, 375 (Fla. 5th DCA 2011).
If a witness cannot recall making the prior inconsistent statement, the fact that the statement was made may be proved by another witness. See id. Section 90.614(2), Florida Statutes (2010), provides that before extrinsic evidence of the contents of the prior statement is admissible, the cross-examiner must ask the witness whether he or she made the prior statement and give the witness the opportunity to admit, explain, or deny making the statement. When the witness does not “distinctly admit” making the prior statement, including when he or she claims an inability to remember making it, extrinsic evidence is admissible to prove the statement was made. § 90.614(2), Fla. Stat.; see also Pugh v. State, 637 So.2d 313, 314 (Fla. 3d DCA 1994).
We find the trial court abused its discretion in prohibiting Elmer from using the 1995 police report as a prior inconsistent statement to impeach C.J. Her testimony at trial conflicted with the statements reflected in the 1995 report. Most importantly, the 1995 report reflected she was twelve years old when the abuse began.[6] Because the victim was the key *203 prosecution witness, Elmer should have been afforded wide latitude in his cross-examination of her.
To further compound the error, the trial court ruled pretrial that Elmer could not call Detective Lucas to offer testimony about the contents of the 1995 report. In order to lay the foundation for impeaching C.J. with extrinsic evidence, Elmer should have been permitted to ask her whether she made the statements reflected in the 1995 report. If she denied or claimed inability to remember making the prior inconsistent statements, the trial court should have allowed Elmer to call Detective Lucas to testify as to what was reflected in the report. Although Detective Lucas admitted she did not have an independent recollection of the investigation, which took place approximately fifteen years before the trial, the detective indicated that she made the report and that she would not have included false information in it. Thus, the trial court erred in granting the State’s motion in limine as to Detective Lucas’s testimony as well.
Contrary to the State’s argument on appeal, these errors were not harmless. In its closing argument, the State emphasized that C.J. was the most credible witness because the abuse was inflicted upon her. As the victim’s credibility was crucial to the prosecution’s case, we conclude that there is a reasonable possibility that these errors contributed to the conviction. See Watts v. State, 450 So.2d 265, 268 (Fla. 2d DCA 1984) (finding harmful error where trial court restricted defense’s cross-examination of key prosecution witness and noting, “[g]iven [the witness’s] central position in the appellant’s case, a different result might have been obtained had the jury been able to hear all of the testimony relevant to [the witness’s] credibility and possible motive for testifying.”).
For the benefit of the parties and the trial court on retrial, we address two other evidentiary issues: the admissibility of certain defense photographs and similar fact evidence. First, Elmer argues the trial court erred in refusing to allow various photographs into evidence.[7] We note in passing that the test for the admissibility of photographic evidence is relevance. See Engle v. State, 438 So.2d 803, 809 (Fla.1983). Relevant evidence is evidence tending to prove or disprove a material fact. § 90.401, Fla. Stat. (2010). Pho *204 tographs can be relevant to a material issue either independently or as corroborative of other evidence. See Ortega-Mantilla v. State, 898 So.2d 1164, 1169 (Fla. 3d DCA 2005). Thus, evidence tending to prove that Elmer moved in with Ann after CJ.’s twelfth birthday was relevant and should have been admitted.[8]
Elmer further contends the trial court erred in the admission of similar fact evidence. Section 90.404(2)(b)l., Florida Statutes (2010), provides, “In a criminal case in which the defendant is charged with a crime involving child molestation, evidence of the defendant’s commission of other crimes, wrongs, or acts of child molestation is admissible and may be considered for its bearing on any matter to which it is relevant.” Similar fact evidence is admissible to corroborate a victim’s testimony that sexual activity occurred by showing the defendant’s propensity for committing such conduct. See Mendez v. State, 961 So.2d 1088, 1090 (Fla. 5th DCA 2007). Similar fact evidence may also be relevant to rebut a defendant’s claim of fabrication by the victim. See Bruce v. State, 44 So.3d 1225, 1229 (Fla. 5th DCA 2010).
Before admitting similar fact evidence, the trial court must determine that there is clear and convincing evidence that the defendant committed the collateral crimes. See McLean v. State, 934 So.2d 1248, 1262 (Fla.2006). If the similar fact evidence is proven by clear and convincing evidence and is relevant, the trial court next must assess whether its probative value is substantially outweighed by the danger of unfair prejudice. In making this assessment, the trial court should evaluate the following nonexclusive factors:
(1) the similarity of the prior acts to the act charged regarding the location of where the acts occurred, the age and gender of the victims, and the manner in which the acts were committed; (2) the closeness in time of the prior acts to the act charged; (3) the frequency of the prior acts; and (4) the presence or lack of intervening circumstances.
934 So.2d at 1262. Additionally, the trial court must consider whether the evidence of the uncharged acts will “confuse or mislead jurors by distracting them from the central issues of the trial”; must assess “whether the evidence is needlessly cumulative of other evidence bearing on the victim’s credibility”; and “must guard against allowing the collateral-crime testimony to become a feature of the trial.” Id.
Evidence of a defendant’s continued sexual abuse of the same victim after the victim turned twelve years old may be admitted as similar fact evidence. For instance, in Hutchens v. State, 730 So.2d 825 (Fla. 2d DCA 1999), the defendant was charged with sexual battery on a victim less than twelve years old. At trial, the lower court allowed the victim to testify that the defendant continued abusing her after her twelfth birthday. The trial court also admitted DNA evidence indicating he had fathered the child she gave birth to when she was thirteen years old. The Second District Court of Appeal upheld the trial court’s admission of the similar fact evidence, noting that it was admissible to corroborate the victim’s testimony that the abuse, in fact, occurred prior to her twelfth birthday. Id. at 827.
On remand, the trial court must reexamine the admission of this evidence in light of the narrow issue to be resolved, i.e., C.J.’s age at the time the abuse com *205 menced. We find unpersuasive the State’s assertion that the evidence of the sexual acts that occurred after C.J.’s twelfth birthday was inextricably intertwined evidence. However, we do not foreclose its admissibility after the trial court has conducted an appropriate analysis and has made the requisite findings.
We need not address the issue raised as to the incomplete read-back of the testimony, trusting that more care will be taken if the issue were to repeat itself. We find no error in the remaining issues raised.
REVERSED AND REMANDED FOR NEW TRIAL.
PALMER and TORPY, JJ., concur.

. By the time charges were filed, the statute of limitations had run on all but the capital sexual battery charge, a fact known to the investigating detective and communicated to the victim.

. Each side called witnesses who remembered various events, such as the purchase of a boat and an injury suffered by Elmer. Specifically, defense witnesses testified Ann bought Elmer a boat shortly after he moved in with her, and the defense entered into evidence a receipt for a boat dated August 9, 1990 — well after CJ.’s twelfth birthday. Additionally, several defense witnesses testified that Elmer and Ann met at a Fourth of July party and began dating immediately thereafter. C.J. testified that Elmer did not suffer any major injuries during the time in which he lived in the house and that she did not remember him wearing a cast or using crutches. The defense, however, offered medical records establishing that Elmer underwent knee surgery on August 11, 1988, requiring him to wear a cast and use crutches. Thus, the defense argued that C.J.’s testimony that Elmer never wore a cast or used crutches, combined with the fact that the surgery took place in August 1988, proved Elmer was not yet living with Ann at the time of the surgery. Because he and Ann met on the Fourth of July, Elmer argued, the evidence indicated they met no earlier than July 1989, after the victim turned twelve.

. C.J. elicited a promise from Elmer that he would not abuse her seven-year-old daughter, stating, "she's going to be 11 pretty soon and that’s when it started between you and I." Elmer responded that Ann never allowed him to be alone with the child.

. This report neither led to the arrest nor prosecution of Elmer.

. One part of the report explicitly provided that C.J. stated that Elmer sexually abused her between August 1989 and an unknown month in 1993. Another part of the report stated that Elmer started abusing C.J. when she was twelve years old. The narrative portion of report, however, reflected that C.J. informed the investigating detective, Detective Lucas, that her stepfather died in March 1989, and Elmer began abusing her when he moved in "the following August.” While interpretation of the report is difficult given an inaccuracy as to the date of the stepfather’s death and inconsistencies within the statement, as discussed herein, the trial court should have allowed its use during the cross-examination of C.J.

. There were other inconsistencies less critical to the ultimate issue in the case. While C.J. testified at trial the abuse occurred on a weekly basis at first and then on a monthly basis as she grew older, the 1995 report suggested that Elmer had abused her on only four occasions. The victim also testified that Elmer forced her to perform oral sex on him, that he performed oral sex on her, and that he digitally penetrated her; but the 1995 report made no mention of oral sex or digital penetration. At trial, the victim described the first time Elmer abused her, stating that she was lying on the couch and he forced her to perform oral sex on him. According to the 1995 report, however, the victim stated that the first time she was abused by Elmer, he forced her to have sexual intercourse with *203 him in the kitchen. At trial, C.J. stated he never fully removed her clothing, but the 1995 report reflected that during one incident of abuse, she woke up to find her "clothes missing.” The victim testified at trial that Elmer had sexual intercourse with her in their camper, yet she did not mention any incidents in a camper to Detective Lucas in 1995.

. CJ.’s half-brother, James Eric, testified that every year after Elmer moved into their house, he shared a birthday party with Elmer’s son, and that both boys’ names were on a single cake during those parties. C.J. also testified she remembered the boys sharing a birthday party in October during the first year in which Elmer lived in the house. Elmer attempted to admit into evidence photographs of one of James Eric’s birthday parties. One photograph was a close-up shot of a birthday cake with only James Eric’s name on it, and another photograph showed James Eric blowing out the candles on that cake with Ann standing nearby wearing a T-shirt she purchased at a March 1989 concert. Elmer contended that the fact Ann was wearing that T-shirt proved the photograph was taken sometime after the March 1989 concert. Because James Eric's birthday is in October, he argued, the photograph was taken no earlier than October 1989. Because the birthday cake had only James Eric's name on it, and James Eric testified that he always shared a birthday cake with Elmer’s son after Elmer moved in, Elmer contended that the pictures suggested he did not yet live with the family in October 1989. The trial court, however, excluded the photographs as irrelevant.

. At the very least, this includes the photograph of Ann wearing the concert T-shirt at the birthday party, as well as the photograph of the birthday cake.