# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D2023-1932
_____

ABRAHAM OMAR MCCRAY III,

 Appellant,

 v.

STATE OF FLORIDA,

 Appellee.

_____

On appeal from the Circuit Court for Alachua County.
James Colaw, Judge.

August 13, 2025

OSTERHAUS, C.J.

 Basic criminal process rights afford defendants the right to present a defense and to confront state witnesses with evidence that tests the accuracy of their testimony. *See* U.S. Const. amend. VI; art. I, § 16(a), Fla. Const. When the State tried Abraham McCray on charges of committing sexual battery on a physically helpless victim, he sought to defend himself by showing that victim-injury evidence vital to the State's case arose from a separate incident with which he wasn't involved. Indeed, the victim conceded in a proffer that she had been violently attacked in a bathroom by a different person attempting a sexual battery just a few days before the incident involving McCray. The trial court, however, repeatedly disallowed McCray to refer to the bathroom attack even after: the victim disclaimed at trial that any

other incident "could have" caused her injuries; an investigating detective proffered that the victim "may have suffered some sort of traumatic injuries resulting in bruising [from the bathroom attack]"; and a nurse testified that the victim's bruises, as a timing matter, could have originated from the bathroom attack. We reverse because McCray had the right to present injury-related evidence and to impeach State witnesses in his own defense using the bathroom-attack evidence.

## I.

After a day of drinking and smoking drugs with McCray and others outside a Gainesville homeless shelter, the victim in this case reported waking up in a tent pitched nearby without her pants on and with McCray wanting her out of the tent. The victim collected her things and with McCray's help returned to her dorm room in the shelter. She claimed no recollection of what had happened over the previous few hours but felt vaginal soreness and had bruising on her body, including on her inner thighs. The victim began asking what had happened and hearing rumors that a recording on the internet showed her having sex with multiple people.

Two days later, the victim went to the hospital where a nurse performed a sexual assault examination. The exam identified injuries, including patterned bruising on the victim's inner thighs along with inflammation and bruising of the victim's cervix. The Gainesville Police Department dispatched a detective who interviewed the victim. The victim reported having no recollection of what had transpired in the tent until she was told to leave the tent.

The detective proceeded from the hospital to the shelter. The detective testified that when she told McCray and others at the shelter that she was there about the victim, everyone thought her investigation concerned the bathroom-attack incident against the victim. Once the detective clarified that she was investigating what occurred in the tent, however, McCray admitted having sex with the victim, who he claimed was conscious and consented to it.

The State proceeded to charge McCray with sexual battery on a physically helpless victim. Before trial, the State filed a motion

2

in limine to keep out of trial the information related to the bathroom attack against the victim. The victim acknowledged that this attempted sexual assault at the hands of another man occurred just a few days before tent incident with McCray. According to the victim's proffer about it, she had been lured into a bathroom and violently grabbed and pushed into a wall and then forward over into the bathroom sink. Despite McCray's repeated requests at key points of the trial to impeach witnesses about injuries from the bathroom attack, the trial court did not allow it because the victim denied any injuries, or that there could have been injuries. And so, ultimately, after hearing only the evidence supporting the State's theory of the victim's bruises—inflicted by McCray in the tent—the jury convicted McCray of sexual battery against an unconscious victim.

## II.

Rulings addressing the admission of evidence are reviewed for an abuse of discretion. *Hendricks v. State*, 34 So. 3d 819, 822 (Fla. 1st DCA 2010). "However, a trial court's discretion over such decisions is limited by the evidence code and the applicable case law, and its interpretation of those authorities is subject to de novo review." *Id.*

McCray argues on appeal that the trial court's various rulings preventing him from impeaching the victim's injury claims at trial was reversible error that doomed his defense. "A defendant has a fundamental right to present witnesses and offer evidence relevant to his defense." *Washington v. State*, 377 So. 3d 637, 638 (Fla. 1st DCA 2023) (quoting *Martin v. State*, 110 So. 3d 936, 938 (Fla. 1st DCA 2013)). "Relevant evidence is evidence tending to prove or disprove a material fact." § 90.401, Fla. Stat. "All relevant evidence is admissible, except as provided by law." § 90.402, Fla. Stat. "[I]t is reversible error to exclude any evidence that 'tends in any way, even indirectly, to establish a reasonable doubt of [a] defendant's guilt.'" *Mizell v. State*, 350 So. 3d 97, 101 (Fla. 1st DCA 2022) (quoting *Martin*, 110 So. 3d at 938); *see also Patrick v. State*, 104 So. 3d 1046, 1056 (Fla. 2012) ("[W]here evidence tends in any way, even indirectly, to establish a reasonable doubt of defendant's guilt, it is error to deny its admission.").

3

The wider context here is important. The State's case posited that the victim had been drugged, fell unconscious, and did not consent to sex with McCray in the tent. It argued that McCray sexually battered the victim in a tent and in a rough manner, as confirmed by: (1) the existence of inner thigh bruises on the victim; and (2) victim testimony that she couldn't remember the sexual encounter. But McCray disputed this. He asserted that he and the victim had consensual sex in the tent after a day of partying. But after learning that there may have been a recording of the encounter (an unfounded rumor), out of shame and embarrassment, the victim falsely claimed to have passed out and not to have consented to the sex.

Because this was a classic "he said, she said" case regarding the victim's consciousness and consent to sex, each side's case set a premium on explaining the origin of inner thigh bruises that appeared on the victim. McCray claimed that the victim's bruises arose not from him, but from an unrelated "violent" attack on the victim from a few days earlier. Indeed, the victim's proffered testimony conceded that she had been lured into a bathroom and violently grabbed and pushed against a wall and over a sink a few days prior to the incident with McCray:

> Q: . . . And is it correct that . . . before waking up in the tent or coming to in the tent [with McCray], a few days before there was like a violent struggle in a bathroom; Is that correct?
>
> A: . . . Yes that's correct.
>
> Q: . . . And that included, basically being lured into a bathroom and then somebody tries to take advantage of you and you basically get into, like, a violent fight with them; is that correct?
>
> A: Uh-huh, yes.
>
> Q: And the struggle, you don't hit the ground but you are pushed into a wall, you hit the wall, and then you get into like this violent struggle from the wall to the sink where

4

you are forcibly pushed against, violently pushed against the sink and fighting a grown man; is that correct?

A: Yes.

Q: And you are forward over the sink; is that correct?

A: Yes.

Q: And this person is grabbing, squeezing, and hurting multiple parts of your body in the course of the struggle; is that right?

A: He grabbed me and pushed me. He wasn't doing anything else. He was trying to push me over.

According to McCray, this violent struggle, with its attendant grabbing and pushing around the hard-surfaced bathroom, caused the inner thigh bruises that the victim attributed to him. In support of this theory, the investigating detective's court-restricted proffer acknowledged that the victim "may have suffered some sort of traumatic injuries resulting in, . . . could result in bruising in the bathroom." And the nurse's testimony conceded that the victim's bruises, as a timing matter, could have originated from either the bathroom attack (McCray's theory) or from the tent (State's theory). Nevertheless, the trial court would not permit McCray to refer to the bathroom attack evidence or ask any questions of the State's witnesses about it.

And here lies the problem. The ability to present a defense and to cross-examine witnesses is "implicit in the constitutional right of confrontation and helps assure the 'accuracy of the truth-determining process.'" *Conner v. State*, 748 So. 2d 950, 955 (Fla. 1999) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)). Cross-examination is the "principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). Removing McCray's ability to ask witnesses about the bathroom attack evidence—a plausible theory about the source of victim bruising—impermissibly curtailed his right to present a defense and to confront the key witnesses against him. With these three

witnesses alone, the ability to cross-examine them about the bathroom attack would have tested the accuracy of victim's source-of-injury claim and focused the jury on deciding between the parties' two different theories of the case: did McCray have rough, bruising, unconsented sex with an unconscious victim in the tent, or did consensual sex occur in the tent with a "victim" who was already bruised from the grabbing and pushing attendant to an unrelated violent attack? The jury should have properly decided this issue.

McCray argues further that restricting the bathroom-attack evidence tilted the trial erroneously against him because of various incomplete references to "another incident" in the State's case. For instance, the victim's trial testimony appeared to swear-off the existence of any other attack by answering "no" when was asked if "there *could have been* another incident where [she] received bruising?" The victim's no-other-incident contention (which conflicted with the detective's proffered concession about potential injuries in the bathroom) was allowed to stand uncontroverted when McCray was denied permission to cross-examine the victim about the bathroom attack. Without cross-examination or additional information about the bathroom attack, the jury had no basis for disbelieving the victim's statement that no other incident "could have" caused her bruises. In other words, the ruling cleared the path for an easy conviction because the trial ended up identifying McCray as the only possible source of the victim's bruises. Had the jury known that the victim had been violently attacked by another man just a few days before, it might not have accepted the victim's injury claim so easily. Furthermore, knowledge of the bathroom attack might have supplied the jury with a plausible reason to question not only the victim's injury claim, but her credibility more broadly on the issue of what occurred in the tent with McCray. *See Maryland v. Craig*, 497 U.S. 836, 845 (1990) (recognizing that allowing defendants to confront their accusers acts as a safeguard of the reliability of criminal proceedings).

The jury also heard about of "another incident" from the detective who testified that when asking around the shelter about what happened to the victim, everyone thought that she was

investigating the bathroom attack, not the McCray-tent incident. The detective stated:

> Initially [after arriving at the shelter], I just said I was there for a specific person and everybody kind of knew or thought they knew what incident I was talking about. They started off talking to me about a different incident. . . . There were around six or seven people there that were all kind of chiming in at the same time. . . . [McCray] started talking to me about a different incident initially but then I specified I want to hear about the victim, . . . he said that he had seen her recently at the bus stop and apologized to her for what had happened.

The defense objected that the detective's testimony referred to the bathroom-attack incident, which shouldn't have been elicited by the State, and made the defendant look guilty of different, additional wrongdoing against the victim. The defense argued at sidebar that the door had been opened three times in the detective's testimony for it to address the bathroom attack directly:

> Now we have the two parts about the other incident that have been to mentioned plus this mention about an apology to something else that did not involve him, . . . I think the door is wide open for us to address the bathroom issue . . . that the Court has said we can't speak about. Now the State has introduced it twice in her direct.

In response, although the trial court acknowledged that "she said it three times; and . . . I mean there comes a point here where this is like reaching the realm of absurd," it nonetheless kept the door closed to McCray to refer to the bathroom attack. It denied a motion for mistrial and, over the defense's objection, settled on giving a curative instruction that the different incident had zero relevance to this case. It ordered the jury to disregard the issue.

But, in fact, the bathroom attack evidence wasn't so irrelevant here. Indeed, basic due process problems attended the exclusion of the bathroom-attack evidence from the jury because it removed McCray's right to test critical injury evidence and to cross-examine the key witnesses against him.

7

This exclusion of relevant evidence and impeachment cannot be considered harmless beyond a reasonable doubt. "The harmless error test requires the State to 'prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.'" *Mantecon v. State*, 373 So. 3d 929, 939 (Fla. 1st DCA 2023) (quoting *State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986)). Other than the victim's bruises, no physical evidence tended to prove the victim's non-consent. With the bathroom attack-related evidence excluded, the State had full latitude in its closing argument to argue that the bruises proved McCray's guilt:

> Did [Appellant's story] look like a man who was telling the truth? . . . We also know that from [the victim,] [s]he can't say that the Defendant did it, right, she never pointed the finger at Abraham McCray. She did tell you that it was her belief that something happened to her because when she woke up, she had bruises on the inside of her thighs. Bruises that were not there before. She had bruises that were causing her pain, right? She said she had a handprint on her. What is important is we heard from [the nurse witness] that the bruise that she observed was, I forget the medical term she used, but she said basically a pattern bruise, like a handprint, right? [The victim] has a handprint on her.

But McCray had a plausible alternate argument, supported by the victim's and defective's proffers, as well as the nurse's testimony, that the victim's bruises originated from violent grabbing and pushing elsewhere. As to other bruising evidence, the sexual assault nurse testified that a bruised cervix could have occurred during sexual intercourse whether consented to or not. In other words, it was explainable under McCray's theory of the case. With all this in view, the trial court's exclusion of the bathroom-attack evidence, which offered a plausible, potentially exculpatory explanation for the victim's thigh bruises, wasn't harmless error beyond a reasonable doubt.

In deciding to reverse for a new trial, we need not reach McCray's second claim that the trial court erred by excluding

evidence of an internet rumor that allegedly embarrassed the victim and caused her to claim, after consenting to sex with McCray, that she had been unconscious.

## III.

We REVERSE Appellant's conviction and REMAND for a new trial.

WINOKUR, J., concurs with opinion;* KELSEY, J., dissents with opinion.

――――――――――――――

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

――――――――――――――

WINOKUR, J., concurring.

As the majority opinion correctly concludes, the trial court violated McCray's Sixth Amendment right to confront the witnesses against him when it improperly limited McCray's ability to conduct a vigorous cross-examination of the victim. *See Crawford v. Washington*, 541 U.S. 36, 61 (2004) ("[The Confrontation Clause] commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination."); *see also Steinhorst v. State*, 412 So. 2d 332, 337 (Fla. 1982) ("The right of a criminal defendant to cross-examine adverse witnesses is derived from the Sixth Amendment and due process right to confront one's accusers. . . . A limitation on cross-examination that prevents the defendant from achieving the purposes for which it exists may be harmful error." (citation omitted)).

―――――――――――

* Judge Winokur was substituted for an original panel member in this proceeding after oral argument.

I join the majority opinion in full, but write separately to demonstrate how the Evidence Code can reduce the risk of constitutional violations, as the Code provides a structured framework for the admissibility of evidence that can aid compliance with Constitutional requirements. To do that, I highlight facts not included in the majority opinion, outline pertinent provisions of the Evidence Code, and then briefly analyze both issues in this appeal.

I

The record reflects the following, additional facts not included in the majority opinion. The victim was a homeless woman living at the GRACE shelter in Gainesville, Florida. Leading up to the incident in January 2021, the victim had been using crack cocaine for several days. On the day of the incident, the victim and other residents at the shelter held a party that lasted for several hours. McCray and the victim were present, but the victim's boyfriend was not. Everyone at the party—including the victim—was consuming alcohol, marijuana, and crack cocaine supplied by McCray.

During the party, the victim consumed four or five 8-ounce cups of liquor and ingested unknown quantities of marijuana and cocaine. When she left the party to get a jacket, a woman known only as Ann told the victim that she would watch the victim's drink while the victim was gone. After she returned to the party, the victim left once again—this time to talk with McCray about getting more crack.

The victim admitted that she was aware of a rumor, circulating the morning after the party, that she engaged in sexual intercourse with multiple people in exchange for drugs. The victim did not want her children to know about her drug use or her sex life. The victim hoped her relationship with a new boyfriend would develop into a long-term commitment. The victim knew that she could be evicted from GRACE if the staff believed that she had voluntarily been using crack, drinking alcohol and having consensual sex on the premises. A toxicology screen revealed that the victim had recently ingested cocaine, marijuana, and alcohol.

During the investigation, the victim falsely told a Detective that she had not used cocaine on the night of the charged crime.

After the incident was reported, the victim received "relocation assistance" from GRACE. As part of that assistance, the victim was "put up in a hotel" for approximately two weeks and given one thousand dollars.

## II

Prior to the commencement of trial, the State filed a motion in limine, seeking to exclude evidence that, prior to the charged crime, the victim "disclosed a separate and unrelated attempted sexual assault that occurred in a bathroom at GRACE." In response, McCray argued that the prior incident was "within 48 hours" of the charged crime, and that the victim was "put into a sink, . . . thrown into walls, and this would be the, explain the bruising on the alleged victim." McCray also claimed that the evidence was "not subject to rape shield" because it described a nonconsensual act. Nonetheless, he suggested that the parties could describe the prior incident as violent but not sexual. The State clarified that it would not rely on the rape shield law to exclude the evidence.

The court granted the motion in limine, telling the parties that it was "not going to allow a prior attempted rape to come in in this case or a prior attack" and telling defense counsel that he would not be permitted to ask "about a prior attempted rape."

At trial, the State presented the following theory of prosecution: at the party, the victim left her drink unattended; when she later consumed that drink, she started to lose her senses; McCray then led the victim to a concealed location where he had sexual intercourse with her while she was incapacitated. For his part, McCray presented the following theory of defense: the victim was a homeless drug addict who traded sexual intercourse for crack cocaine; after word got out about what really happened at the party, she fabricated a story to conceal from her children and her new boyfriend what she had done.

## III

In addition to the Constitutional violation discussed in the majority opinion, I conclude that the trial court exceeded its role as gatekeeper under the Florida Evidence Code when it improperly limited McCray's ability to impeach the credibility of the victim. *Cf. Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *cf. also United States v. 14.38 Acres of Land, More or Less Situated in Leflore County, State of Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996) ("[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system. . . ." (citing *Daubert*)).

### A
### *Relevancy statutes*

Section 90.402, Florida Statutes, states that "[a]ll relevant evidence is admissible, except as provided by law." § 90.402, Fla. Stat. Additionally, section 90.401, Florida Statutes, defines relevant evidence as "evidence tending to prove or disprove a material fact." § 90.401, Fla. Stat.; *see also Zabner*, 227 So. 2d at 545 ("Relevancy describes evidence that has a legitimate tendency to prove or disprove a given proposition that is material as shown by the pleadings. Relevancy has been defined as a tendency to establish a fact in controversy or to render a proposition in issue more or less probable." (citation omitted)). Evidence is relevant if it can "independently prove a material fact or issue," but also "if it goes to discredit a witness by pointing out bias, corruption, or lack of competency." *Lawson v. State*, 651 So. 2d 713, 715 (Fla. 2d DCA 1995) (*citing Gelabert v. State*, 407 So. 2d 1007, 11010 (Fla. 5th DCA 1981)). Put another way, "facts which on principles of sound logic tend to sustain or impeach a pertinent hypothesis of an issue are to be deemed relevant and admitted in evidence, unless proscribed by some positive prohibition of law." *Watkins v. State*, 163 So. 292, 293 (Fla. 1935).

Finally, "[a]lthough the determination of relevancy is within the trial court's discretion, a trial court's discretion in determining the relevancy of evidence is limited by the rules of evidence and applicable case law." *Healthcare Underwriters Grp., Inc. v. Sanford*, 337 So. 3d 32, 41 (Fla. 4th DCA 2022).

Even relevant evidence cannot be admitted "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." § 90.403, Fla. Stat.

It is true that "[m]ost evidence that is admitted will be prejudicial or damaging to the party against whom it is offered." C. Ehrhardt, Florida Evidence § 403.1 (2024 ed.). So "[f]or relevant, probative evidence 'to be deemed unfairly prejudicial, it must go beyond the inherent prejudice associated with any relevant evidence.'" *Valentine v. State*, 307 So. 3d 726, 735 (Fla. 4th DCA 2020) (*quoting Martinez v. State*, 265 So. 3d 704, 705 (Fla. 4th DCA 2019). On appeal, the reviewing court applies an abuse of discretion standard to any challenge under section 90.403. *See Johnson v. State*, 969 So. 2d 938, 951 (Fla. 2007). If the appellate court finds that the trial court erred in admitting or excluding the challenged evidence under section 90.403, then the court should reverse unless the error is harmless. *See Carrillo v. State*, 727 So. 2d 1047, 1048 (Fla. 2d DCA 1999).

B

*Impeachment statute*

Section 90.608, Florida Statutes, governs the impeachment of witnesses. In pertinent part, that statute permits the following methods of attacking the credibility of a witness:

1. "Introducing statements of the witness which are inconsistent with the witness's present testimony." § 90.608(1), Fla. Stat.

2. "Showing a defect of capacity, ability, or opportunity in the witness to observe, remember, or recount the matters about which the witness testified." § 90.608(4), Fla. Stat.

13

3.    "Proof by other witnesses that material facts are not as testified to by the witness being impeached." § 90.608(5), Fla. Stat.

"All witnesses who testify during a trial place their credibility in issue." *Chandler v. State*, 702 So. 2d 186, 195 (Fla. 1997) (quoting C. Ehrhardt, Florida Evidence § 608.1 (1997 ed.). "Although cross-examination is generally limited to the scope of the direct examination, the credibility of the witness is always a proper subject of cross-examination." *Id.* Therefore, "[l]imiting the scope of cross-examination in a manner which keeps from the jury relevant and important facts bearing on trustworthiness of crucial prosecution testimony is improper, especially where the cross-examination is directed at a key prosecution witness." *Mendez v. State*, 412 So. 2d 965, 966 (Fla. 2d DCA 1982) (emphasis supplied, citations omitted).

### C
### *Hearsay statute*

Section 90.801, Florida Statutes, defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." § 90.801(1)(b), Fla. Stat. "If testimony is offered for a purpose other than to prove the truth of the matter asserted, it is by definition not hearsay." *King v. State*, 684 So. 2d 1388, 1389 (Fla. 1st DCA 1996). Accordingly, "if a statement is offered to show the effect on the listener rather than the truth of the statement, it is not hearsay." *Lauwereins v. State*, 328 So. 3d 1041, 1042 (Fla. 1st DCA 2021) (*quoting Pitts v. State*, 227 So. 3d 674, 678 (Fla. 1st DCA 2017)).

Similarly, impeachment evidence is not hearsay. *See Tarner v. State*, 938 So. 2d 635, 637 (Fla. 5th DCA 2006) ("A statement offered to impeach a witness is not hearsay because it is not offered to prove the truth of the matter asserted. Rather, it is offered to show why the witness is not trustworthy." (citation omitted)).

### D
### *Rape Shield statute*

Subsection (2) of the "rape shield" law, section 794.022, Florida Statutes, states in pertinent part:

14

Specific instances of prior consensual sexual activity between the victim and any person other than the offender may not be admitted into evidence in a prosecution under s. 787.06, s. 794.011, or s. 800.04. However, such evidence may be admitted if it is first established to the court in a proceeding in camera that such evidence may prove that the defendant was not the source of the semen, pregnancy, injury, or disease.

By its express terms, the rape shield law does not apply to non-consensual sexual activity.

## E
### *Harmless error*

To show an error is harmless, the State must establish beyond a reasonable doubt that the error did not contribute to the jury's verdict. *See State v. DiGuilio*, 491 So. 2d 1129, 1138 (1986). "Put another way, '[t]o say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'" *Schluck v. State*, 329 So. 3d 231, 239 (Fla. 1st DCA 2021) (citations omitted).

## IV

## A

With regard to the first issue, the trial court committed reversible error when it prohibited McCray from questioning the victim about the bathroom incident. By providing an alternative explanation for the source of the victim's bruises, the bathroom incident tended to support McCray's theory of defense that the charged offense involved consensual sexual intercourse. Because it involved nonconsensual activity, the bathroom incident did not fall under Florida's rape shield law. Additionally, the danger of unfair prejudice did not outweigh the probative value of the evidence. Finally, the bathroom incident provided McCray with an opportunity to impeach the credibility of the victim by exposing a possible inconsistency.

Instead of acknowledging the impeachment value of the bathroom incident, the dissent focuses on whether evidence of that

incident involves speculative hearsay. But that analysis misses the point. The bathroom incident was not relevant because it provided substantive proof that the victim suffered bruising before she entered McCray's tent; rather, the incident was relevant because, as impeachment evidence, it attacked the credibility of the victim. The inconsistency between the victim's actual testimony and her proffered testimony proves this point. During her actual testimony, the victim adamantly asserted that she had *no* bruises anywhere on her body before she entered McCray's tent. But during the proffer, the victim testified that, just a few days prior, an unknown assailant "grabbed" her and "pushed" her against a bathroom sink. Furthermore, she admitted that the bathroom incident was "a violent struggle" and "a violent fight" with a grown man. Thus, on the one hand, the victim testified that she had no bruises on her body before she entered the victim's tent. On the other, she admitted that, just a few days before the alleged rape, she suffered a "violent" attack.

Despite this inconsistency, the trial court refused to allow *any* evidence of the bathroom incident to come before the jury, justifying the decision only by indicating that it would not permit evidence regarding a "prior attempted rape.*

Nevertheless, both the State and the dissent fault McCray for failing to offer any substantive evidence of prior bruising. The State asserts that McCray "has produced no evidence of earlier injuries to her body[,]" and the dissent highlights "the utter lack of admissible evidence that *any* injury occurred in the bathroom attack." But these arguments fail to acknowledge that there was "no evidence of any bruising on the victim's body that preexisted the sexual battery" because the trial court excluded it—not because no such evidence existed. Furthermore, McCray did not need to offer any substantive evidence of bruising as a condition precedent to using the bathroom incident as impeachment evidence during cross-examination.

---

* While the court did not indicate that it was excluding the evidence under the Rape Shield statute, it is worth repeating that the Rape Shield statute does not apply to evidence of nonconsensual sexual activity. § 794.022(2), Fla. Stat.

In addition to faulting McCray for failing to offer what the trial court expressly prohibited, the dissent criticizes the majority for "rel[ying] on speculation and inference to conclude that the trial court should have allowed two witnesses to testify that they 'heard' something about the earlier attack on the victim in a bathroom." But it appears that those witnesses "heard" about the bathroom incident from the victim herself as the State conceded below. Those statements—presumably by the victim to the nurse and the law enforcement officer mentioned by the dissent—could have been inconsistent with the victim's trial testimony. *See* § 90.608(1), Fla. Stat.

If the victim minimized the bathroom incident, then McCray could have impeached the victim with those prior statements provided those statements were inconsistent with the victim's trial testimony.

As impeachment evidence, those prior inconsistent statements would not have been inadmissible hearsay. *See Elmer v. State*, 114 So. 3d 198, 202 (Fla. 5th DCA 2012) ("[A] prior inconsistent statement admitted for impeachment purposes is not hearsay because it is not being offered for the truth of the matter asserted." (citation omitted).

Finally, McCray could have used any inconsistent testimony by the victim as well as any prior inconsistent statements to attack the victim's credibility during his closing argument. *See Hamilton v. State*, 351 So. 3d 1275, 1278 (Fla. 1st DCA 2022) (noting that counsel during closing argument may 'argue credibility of witnesses or any other relevant issue so long as the argument is based on the evidence.'" (citations omitted)).

B

McCray also argues that the trial court committed reversible error when it prohibited McCray from questioning the victim about a rumor, circulating the morning after the party, that she traded sex for drugs the night before. The majority opinion does not address this issue, but I find that it also supports reversal because "[t]he right of cross-examination . . . includes the right to examine a witness as to matters affecting his credibility, including a

17

possible motive for testifying." *See Kelly v. State*, 425 So. 2d 81, 83 (Fla. 2nd DCA 1982).

In asking the victim whether she was aware of the rumor, McCray did not seek to elicit hearsay from her; rather, he sought to impeach the victim's credibility by exposing a possible motive to fabricate.

## V

Ultimately, the victim's credibility was key to the State's case for several reasons: McCray admitted that he had sexual intercourse with the victim on the night of the party, but maintained that the intercourse was consensual; the victim testified that she did not remember having sexual intercourse with McCray; and, the bruising provided the only physical evidence supporting the State's theory that the victim was helpless to resist. *See Tomengo v. State*, 864 So. 2d 525, 530 (Fla. 5th DCA 2004) ("The right to a full cross-examination is especially necessary when the witness being cross-examined is the key witness on whose credibility the State's case relies." (citing *Yolman v. State*, 469 So. 2d 842, 843 (Fla. 2d DCA 1985))).

Given that importance, the State failed to establish beyond a reasonable doubt that the restricted cross-examination of the victim did not contribute to the verdict. Accordingly, we are correct in reversing McCray's conviction.

KELSEY, J., dissenting.

Respectfully, I dissent and would affirm. The majority analysis relies improperly on speculation and inference to conclude that the trial court should have allowed two witnesses to testify that they had "heard" something about the earlier attack on the victim in a bathroom. These were the sexual assault nurse who examined the victim after that later assault, and the detective who later investigated the assault for which Appellant was on trial. However, neither of those two witnesses had any direct knowledge about the earlier bathroom attack or any injury it might have caused. The nurse did not examine the victim for that attack, and the detective did not investigate it. Only the victim and her assailant had first-hand knowledge about the bathroom attack,

and the assailant did not testify (nor is it clear that he was identified).

The victim clearly and consistently distinguished the two attacks. She testified to the injuries she sustained in the attack at issue in Appellant's brother's tent: "My body was hurting and I had purple, green, and black bruises on the *inside of my thighs* . . . . I had a cut on my chest. I had a handprint on my arm. My [vaginal] area was kind of sore." (Emphasis added.)

Consistent with the victim's testimony, the sexual assault nurse who examined the victim after the second assault testified that the injuries she documented were "[f]ocus[ed] specifically from the *pelvis, hips, down*. Several bruises . . . [including] three [patterned bruises such as a handprint might leave] externally to, or to her medial or *inner thigh*, as well as erythema, redness, irritation and inflammation, ecchymosis, bruising to her cervix." (Emphasis added.) The nurse's pictures in evidence depict two very distinct, dark, parallel, finger-shaped and finger-length bruises high up on the victim's right thigh, slanting slightly upward and outward. General bruising is pictured in about the same place on the victim's left upper thigh. It looks exactly like there was one hand gripping or pushing hard on the right thigh and generalized pressure on the left, as if someone facing the victim were pushing her thighs up and out. The jury saw those pictures, just as we do. The nurse also photographed the victim's cervical injury because it was so severe that this was only the third time that she had photographed the cervix in her eleven-year nursing career, including three years as a certified sexual-assault nurse examiner with 78 exams completed.

In contrast to the evidence documented following the relevant attack in the tent, no evidence whatsoever established that the earlier bathroom attack was a sexual assault or that the victim's upper-inner thighs were bruised at all, let alone with parallel finger-length-and-shaped bruises as depicted in the assault nurse's pictures. To the contrary, the only competent evidence on the question came from the victim's sworn testimony expressly *denying* that she sustained bruising, cuts, or anything else before the sexual assault in Appellant's brother's tent:

19

They [injuries] did not happen before, I will tell you that. That did not happen before. There were no bruises, there were no scars, there were no cuts, there was nothing on my body before I went into the tent. . . . [A]s I told you before, before I went in the tent I had nothing. When I left out of that tent, I had purple, green, black marks on the inside of my thighs, cuts and everything. So how in the world could that happen?

During a subsequent proffer, defense counsel tried to elicit the victim's testimony that the bathroom attacker was "grabbing, squeezing, and hurting multiple parts of your body." But the victim squarely denied that, testifying that "[h]e grabbed me and pushed me. He wasn't doing anything else. He was trying to push me over." She denied having "any sort of violence or struggles with anybody else" before the assault at issue. On cross during the proffer, the State again asked the victim if she had "any of the bruises that you mentioned in your direct, the bruising to your thighs, the bruising on your clavicle, the scratch, the handprint, did you have any of those bruises as a result of the bathroom incident?" The victim said no.

No other evidence expands on the specifics of the bathroom attack. Apparently it was not reported to law enforcement, and the victim did not seek medical care for it. The alleged perpetrator was not identified and did not testify. No other witness testimony existed to provide details. There are no pictures, drawings, floor plans, videos, or testimony depicting the scene to inform an analysis of what injuries logically could have occurred from the victim's contact with the surfaces in the bathroom. No evidence shows exactly what the bathroom contained, the materials from which the contents were made, or the size or layout of the room. No evidence establishes the height of the sink or countertop (nor the victim's height); whether the edges were smooth or sharp; whether the under-sink area was closed or open; the nature, materials, or size of any plumbing fixtures; the type of flooring material; or whether there was anything else in the bathroom that the victim could have contacted. No admissible evidence ties the victim's injuries to the bathroom attack, particularly as compared to the clear testimonial and pictorial evidence that the victim's worst thigh bruising was finger-length, parallel, and high up on

her inner thighs. Anything else is merely inadmissible speculation and inference.

The majority's conclusion—that the sexual-assault nurse and a police detective should have been allowed to testify that they had "heard about" the earlier attack—resorts improperly to speculation and inference. While it is true that as a general rule all relevant evidence is admissible as provided in the evidence code, the key is that there are exceptions to that rule: "except as provided by law." § 90.402, Fla. Stat. (2021). But the law does not allow witness testimony that lacks evidentiary foundation and is mere hearsay or speculation. § 90.802, Fla. Stat. ("Except as provided by statute, hearsay evidence is inadmissible."). Neither the detective nor the nurse had any first-hand knowledge about the bathroom assault, so any testimony they might have given about what they "heard" about the earlier incident would have lacked factual foundation and been inadmissible as hearsay and mere speculation. No exception to the hearsay exclusion was asserted—nor could one have been, on this record. The trial court correctly excluded this testimony.

The majority also improperly leaps from the nurse's testimony that a bruise cannot be "aged" based solely on appearance (i.e., that time of injury cannot be determined based on appearance alone), to the conclusion that this testimony could mean the victim's bruising could have happened in the earlier bathroom attack. But that reasoning ignores the remainder of the evidence. The nurse *disagreed* with the proffered conclusion, noting that the victim had said the bruises were new and from the sexual assault, not from any earlier cause. This line of reasoning is also belied by the utter lack of admissible evidence that *any* injury occurred in the bathroom attack.

The majority's reasoning also fails as applied to the detective's proffered testimony. The detective was asked in a defense proffer whether she was aware that the victim "may have suffered some sort of traumatic injuries [that] could result in bruising" in the earlier attack. We know from the record that the detective had heard about the bathroom attack, but that knowledge was not in evidence. The parties agreed before trial that the detective would not testify about the bathroom incident. When the detective made

21

an oblique reference to another incident, the trial court—by agreement of both parties—instructed the jury that "that different incident has zero relevance to Mr. McCray or this case, and I'm striking those references from the record and ordering you all to disregard them."

On this record it is far from clear that the detective's purported—apparently hearsay—knowledge of the bathroom incident would have constituted competent evidence that the victim's specific (and photographically documented) inner-thigh bruising could have occurred in that incident. No record evidence supports such a conclusion; it would be pure speculation. There is no evidentiary foundation for concluding that the detective's testimony would have furnished admissible non-hearsay evidence of bruising from the bathroom assault. The trial court properly excluded it. That leaves as the only competent, relevant, and preserved evidence that there was *no* internal-thigh bruising from the bathroom attack such as was documented in the later sexual assault. We should affirm.

_____

Jessica J. Yeary, Public Defender, and Richard M. Bracey, III, Assistant Public Defender, Tallahassee, for Appellant

James Uthmeier, Attorney General, and Julian E. Markham, Assistant Attorney General, Tallahassee, for Appellee.